UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| NICOLE KNISLEY,<br><br>Plaintiff,<br><br>·vs.<br><br>LAKE COUNTY, a political subdivision of the<br>State of South Dakota; and TIM WALBURG,<br>individually and in his official capacity,<br><br>Defendants. | 4:14-CV-04178-RAL<br><br>OPINION AND ORDER GRANTING<br>DEFENDANTS' MOTION FOR SUMMARY<br>JUDGMENT |

Plaintiff Nicole Knisley ("Knisley") brought suit against Defendants—her former employer, Lake County, and her former supervisor, Lake County Deputy Sheriff Tim Walburg ("Walburg")—alleging Defendants retaliated against her for exercising her right to free speech guaranteed by the United States Constitution and the South Dakota Constitution. Doc. 1 at 6–10. Knisley seeks monetary relief, including attorney's fees and punitive damages. Doc. 1 at 10–11. Defendants moved for summary judgment on all claims, Doc. 27, which Knisley opposes, Doc. 37. For the reasons explained below, Defendants motion for summary judgment is granted.

## I.  FACTS PERTINENT TO MOTION

Knisley became employed as a Lake County Deputy Sheriff in April of 2008. Doc. 28 at ¶ 1; Doc. 39 at ¶ 1. At that time, Walburg was the Lake County Chief Deputy Sheriff. Doc. 40-15 at 9, 19. In 2008, Knisley suspected that there were discrepancies in how Walburg was reporting his hours worked under a federal DUI grant. Doc. 40-15 at 22. Knisley's suspicion began when she believed that Walburg was at home during a time when he reported having been

1

working. Doc. 40-15 at 22. After that incident, Knisley began tracking Walburg's hours worked under the grant. Doc. 40-15 at 23. Knisley testified that in 2010 she began collecting documents regarding Walburg's actual hours worked under the grant. Doc. 40-15 at 23. She testified that some of the documents she gathered were in her office, some were gathered from her supervisor's desk, and others were obtained from a Lake County dispatcher. Doc. 40-15 at 23, 25–27. Using those records, Knisley created a summary sheet for every pay period in 2010 that compared how Walburg was paid with Walburg's time-log sheets. Doc. 40-15 at 23–24. Based on that summary sheet, Knisley suspected that Walburg had been paid $5,583.27 more than he had actually worked and earned under the grant. Doc. 40-15 at 24.

According to Knisley, while she was a deputy sheriff, if she suspected criminal activity of any resident of Lake County, she was obliged to investigate it. Doc. 40-15 at 22. Knisley had not been trained on what to do if she suspected criminal activity of a fellow law enforcement officer,[1] Doc. 40-15 at 22, but Knisley testified that in her capacity as a law enforcement officer, she believed that she had the right to obtain relevant documents and to conduct the investigation, Doc. 40-15 at 25.

In 2011, Knisley first reported her suspicion about Walburg to Lee Axdahl, an official with the South Dakota Office of Highway Safety, who was responsible for administering the federal DUI grant funds. Doc. 40-15 at 30. As a result of her report, an audit was conducted by Dennis Falken, an outside auditor for the State of South Dakota. Doc. 40-15 at 30. After Falken completed his review, Falken apparently spoke with Walburg; according to Walburg, Falken did not have any concerns, said the department was doing a good job, and told Walburg that he should "tweak" how things are documented, such as providing more information in certain areas.

---

[1]Other deputies similarly testified that they were unsure what the policy or procedure would be if they had suspected the same about Walburg. Doc. 40-19 at 6; Doc. 40-20 at 6.

Doc. 40-16 at 18. Walburg attested that he was unaware that Knisley was the one who reported him. Doc. 35 at ¶ 3. Sometime after the audit, Lake County quit applying for the grant funds because, according to Walburg, no one continued to utilize them. Doc. 40-16 at 19. Knisley was never told the results of Falken's audit. Doc. 40-15 at 30.

In mid-December of 2012, Walburg was appointed Lake County Sheriff, filling the remainder of former and retiring Sheriff Roger Hartman's term. Doc. 35 at ¶ 4; Doc. 40-15 at 9. During the time Hartman supervised Knisley, he never pursued formal disciplinary action against her and believed her to be an "average" and "good" officer. Doc. 40-21 at 3–4. Knisley received commendations from the Federal Bureau of Investigation (FBI) and the Department of Justice for her involvement in a criminal investigation while she was a deputy sheriff. Doc. 40-15 at 18. Knisley received a performance evaluation in 2011 ("2011 Performance Evaluation") while under Hartman's supervision.[2] Doc. 42 at ¶ 3. Overall, the 2011 Performance Evaluation rated Knisley as meeting expectations. Doc. 40-2 at 2–3. Notations were made, however, that Knisley needed to improve on her case report and investigative skills as well as her use of time. Doc. 40-2 at 2, 4.

Shortly after Walburg became Sheriff, Knisley expressed an interest in filling the vacated Chief Deputy position. Doc. 40-16 at 5. According to Walburg, Knisley demanded that Walburg make a quick decision on the matter. Doc. 35 at ¶ 5; Doc. 40-16 at 5. Walburg testified that he never expected Knisley to say something of that nature and in that context, so after their conversation he began documenting Knisley's work issues as they arose. Doc. 35 at ¶ 5; Doc.

---

[2] Hartman classified himself as "old school," meaning he preferred to talk with his employees face-to-face rather than evaluate their work performance on "a piece of paper." Doc. 40-21 at 3, 5. Because of this, Walburg completed some performance evaluations while he was Chief Deputy Sheriff. Doc. 40-21 at 5. Walburg attested that he completed Knisley's 2011 Performance Evaluation at Hartman's direction and that Hartman later presented the 2011 Performance Evaluation to Knisley. Doc. 42 at ¶ 3.

3

35-1; Doc. 40-16 at 5. Walburg's documentation totals eight pages and includes several notations regarding Knisley's work performance dating from December 17, 2012 to August 29, 2013. Doc. 35-1. Some of those notations from December 17, 2012 to February 13, 2013 included Knisley's behaviors regarding gun use in the jail and her failure to fully and timely document investigations. Doc. 35-1 at 1–3. Knisley does not believe that Walburg's documentation was contemporaneous. Doc. 39 at 8–9. Because Knisley was not provided Walburg's documentation, she did not have the opportunity to respond to Walburg's alleged accounts; Knisley also claims that Walburg did not follow Lake County policy in creating his own notes regarding Knisley's performance. Doc. 39 at 8–9.

Walburg sought advice regarding Knisley's conduct from Chris Giles,[3] an attorney and at that time a County Commissioner for Lake County, in December of 2012. Doc. 40-17 at 11. Giles testified that Walburg came to his private law practice on several occasions and shared his concerns about Knisley. Doc. 40-17 at 11–12. Giles advised Walburg to put Knisley on a "Plan of Assistance or a Plan of Improvement" so that she could change her behavior. Doc. 40-17 at 12.

On February 13, 2013, Walburg met with Knisley and conducted a performance review ("2013 Performance Evaluation"). Doc. 40-3 at 2, 4. Areas noted where Knisley needed improvement included completing work as scheduled, thoroughness and accuracy of work done, concern for safety, use of time, observance of rules and policies, acceptance of authority,

---

[3] Giles had previously served as the part-time Lake County State's Attorney from January of 1997 to June of 2005. Doc. 40-17 at 3. After working as Executive Director for Dakota State University and later in private practice, Giles was elected as a commissioner for Lake County and served in that capacity from January 2009 to March of 2013. Doc. 40-17 at 3–4. Giles resigned from his commissioner seat and simultaneously resumed his position as Lake County State's Attorney, serving in that capacity until his appointment as a magistrate judge on July 1, 2015. Doc. 40-17 at 4–5.

4

initiative, cooperativeness with co-workers, the ability to learn from mistakes, and decisiveness. Doc. 40-3 at 2–4. Walburg also told Knisley that her reports should have better flow, paragraph spacing, and answer "the who, what, when, where, and how" questions. Doc. 40-3 at 2. During that meeting, Knisley disagreed with parts of the evaluation, so Walburg crossed out two notations that addressed the chief deputy position and Knisley's cooperativeness with co-workers. Doc. 40-3 at 3–4; Doc. 40-15 at 15; Doc. 40-16 at 17. Four days after the meeting, Knisley wrote a formal response to Walburg, taking issue with several additional performance problems identified in the 2013 Performance Evaluation. Doc. 40-4. Walburg testified that he continued to counsel or talk with Knisley about her performance issues after the 2013 Performance Evaluation, but admitted that he did not provide any additional documentation to Knisley.[4] Doc. 40-16 at 13–14.

Walburg testified that Knisley's performance did not improve after the 2013 Performance Evaluation. Doc. 40-16 at 31. Although Knisley corrected some behaviors, according to Defendants, issues persisted with the quality and timeliness of her reports.[5] Doc. 40-16 at 31.

---

[4]Knisley submits that Walburg should have documented his efforts and concerns after the 2013 Performance Evaluation pursuant to an Early Intervention Policy ("EIP") which was implemented on May 17, 2013 for employees of the Sheriff's Department who were "exhibiting symptoms of stress or other behavior that could pose a liability to the community, the Department, or the officer." Doc. 40-14 at 2. Under the EIP, it is "the responsibility of the officer's chain of command, to recommend, in writing, the appropriate action to correct any deficiency that might be identified." Doc. 40-14 at 3. Recommended actions include a range of options from no action to counseling, re-assignment, additional training, or other appropriate action. Doc. 40-14 at 3. Once an action plan is discussed with the officer, EIP is "engaged" and a follow-up component is to be established to "ensure the behavior that triggered the intervention is no longer a concern." Doc. 40-14 at 3. Walburg testified that it was his responsibility to comply with and implement the EIP when, for example, an employee has performance issues, experiences problems outside of the workplace, or confronts a medical issue. Doc. 40-16 at 10–11.

[5]Knisley testified that Walberg did not give her any instructions on how to properly fill out her paperwork, Doc. 40-15 at 13, but direction was provided in the comments section of the 2013 Performance Evaluation, Doc. 35-2 at 1.

Knisley testified that sometime in 2013 she used her cell or home phone to make numerous reports to various outside agencies about Walburg's record-keeping discrepancies in relation to the grant program. Doc. 40-15 at 31. She called Trevor Jones ("Jones"), Director of Public Safety for the State's Highway Department. Doc. 40-15 at 31. Jones told Knisley to call the State's Division of Criminal Investigation (DCI). Doc. 40-15 at 31. Knisley then reported her suspicions to DCI agents Brian Zeeb ("Zeeb") and Dan Satterlee ("Satterlee"). Doc. 40-15 at 31–32. Knisley also called Bill Golden ("Golden") at the Attorney General's office. Doc. 40-15 at 35. Knisley does not remember whether she called Jones, the DCI agents, or Golden before or after her 2013 Performance Evaluation. Doc. 40-15 at 31–32, 35.

In approximately March of 2013, Knisley shared her suspicions about Walburg with Lake County Commissioner Kelli Wollman ("Wollman") at Wollman's home.[6] Doc 40-15 at 32–33; Doc. 40-22 at 7–8. Lake County is governed by a five-person County Commission which oversees all aspects of county business, including the sheriff's department and adherence to employee policies. Doc. 40-22 at 3–4, 11. In 2013, the five members of the County Commission were Chairman Scott Pedersen, Dan Bohl, Ron Golden, Roger Hageman, and Wollman. Doc. 40-22 at 3; Doc. 40-23 at 3; Doc. 40-24 at 4–5; Doc. 40-25 at 3; Doc. 40-26 at 3, 5. Knisley testified that she showed Wollman the documentation gathered in her investigation and told Wollman that she already had reported Walburg to the "appropriate authorities." Doc. 40-15 at 32. Wollman testified that she told Knisley to bring the matter up to the entire commission, rather than just one member, but Knisley told Wollman that she would not do that. Doc 40-22 at 7.

---

[6]Knisley briefly spoke with Wollman outside the Sheriff's Office some months before March of 2013, but Wollman testified that the conversation was brief because it was cold outside. Doc 40-15 at 32–33; Doc. 40-22 at 7–8.

In April of 2013, Knisley met with DCI agents Zeeb and Satterlee and presented them with the documents she had collected in her investigation of Walburg. Doc. 40-15 at 33. Knisley did not, however, provide the agents with her summary sheet because she testified that she wanted the DCI to reach its own conclusions. Doc. 40-15 at 33.

DCI agent Brian Gortmaker ("Gortmaker") later interviewed Walburg about possible fraud in his use of the federal DUI grant. Doc. 40-16 at 20. Walburg asked who made the complaint prompting the interview, but Gortmaker did not tell Walburg who made the report. Doc. 40-16 at 21.

On August 7, 2013, the County Commissioners received an anonymous letter concerning Walburg which requested that the Commission investigate Walburg and his alleged abuse of grant funds in 2010, 2011, and 2012. Doc. 40-5 at 2. Knisley testified that she does not know who sent the anonymous letter. Doc. 40-15 at 40. After Wollman received the anonymous letter, she told Giles, who at that time was serving as Lake County State's Attorney, about the conversation she had with Knisley earlier in March. Doc. 40-22 at 8. Giles scheduled a time during the Commission's next executive session so that Walburg could tell the commissioners that he had been interviewed about his timekeeping practices in relation to the DUI grant, that the matter was being investigated by the DCI, and that he believed that he had not done anything wrong. Doc. 40-16 at 22–23. At the executive session, Hartman also appeared and told the commissioners that although Walburg was under investigation, he believed that Walburg did not do anything improper. Doc. 40-23 at 15. The Commission took no action after the executive session. Doc. 40-23 at 15; Doc. 40-26 at 6–7. Commissioner Bohl later testified that the concern at the executive session was not who the "whistleblower" was because "it could [have]

7

be[en] any of several" people. Doc. 40-24 at 7. Bohl did not identify who those several people were. Doc. 40-24 at 7.

Also, in early August of 2013, three deputies—Grant Lanning, Charlie Pulford, and Sarina Talich—met with Walburg and expressed concerns about Knisley and her work performance. Doc. 40-16 at 24. After consulting with Giles, Walburg testified that he asked the three deputies to put their concerns in writing. Doc. 40-16 at 24. Each deputy did so and submitted their undated and unsigned statements to Walburg. Doc. 32-1; Doc 32 at ¶ 2; Doc. 33-1; Doc. 33 at ¶ 2; Doc. 34-1; Doc. 34 at ¶ 2. Walburg took the deputies' statements to Giles. Doc. 40-16 at 24. Giles kept the statements in his office and allowed the commissioners to review them in his office at their own convenience. Doc. 40-22 at 11. At least three commissioners—Wollman, Pedersen, and Bohl—read the deputies' statements. Doc. 40-22 at 11; Doc. 40-23 at 13; Doc. 40-24 at 5. Commissioner Hageman did not read the letters, Doc. 40-25 at 5, and Commissioner Golden did not testify on the matter, see Doc. 40-26.

Lanning's statement expressed concern that Knisley, who was his primary field training officer, did not fully document or provide him with proper training and that Knisley placed him in potentially hazardous situations. Doc. 40-7 at 2. He also wrote about general concerns of workplace morale and that Knisley did not conclude her shifts safely by following proper "shift pass down," was unwilling to assist other officers on duty, and refused to put in an effort to share in the workload. Doc. 40-7 at 2–4. Lanning also believed that "Deputy Knisley has a blatant disregard for the safety of her fellow coworkers." Doc. 40-7 at 3. Lanning later testified, however, that he is not aware if there was any particular training program for him to complete and that "shift pass down" is discretionary. Doc. 40-20 at 4, 13.

8

Pulford had concerns about Knisley's general attitude and lack of regard for office policies and procedures. Doc. 40-6 at 2–3. He gave examples of Knisley's unwillingness to share in the workload and courtroom duties. Doc. 40-6 at 2. Pulford complained that Knisley was spending time at Family Dollar in Madison, talking to her sister who works there and shopping while in uniform. Doc. 40-6 at 2. Pulford also wrote that morale had decreased in the office, that he did not trust Knisley, that she was manipulative, and that he did not believe she cared for the other deputies' safety. Doc. 40-6 at 3. Afterwards, Pulford testified that he mainly took issue with Knisley's unwillingness to work beyond her shift; for example, there were times when Knisley would receive a call at or near the end of her shift, and instead of handling the call herself, she would forward the call onto the next shift. Doc. 40-18 at 9–10. Pulford resigned on June 1, 2015, because of his own general tardiness after several reprimands and a brief suspension, and after having been given the option to resign or be terminated. Doc. 40-18 at 3– 5.

Talich's statement described admissions Knisley had made to Talich, including that Knisley supposedly had accepted food in exchange for not giving a traffic citation and that she had taken food from the community gardens in the past. Doc. 40-8 at 2–3. Talich reported that Knisley was spending time at Family Dollar with her sister and expressed concerns that Knisley failed to do activity logs until repeatedly asked to do so by Walburg, refused to upload videos from traffic stops, and reluctantly took a department photo after multiple emails and requests. Doc. 40-8 at 2–3. According to Talich, Knisley did not complete her reports in a timely fashion and did not share in the workload.[7] Doc. 40-8 at 2–5. During her deposition, Talich testified that

---

[7]Both Pulford and Talich also complained about Knisley taking time off for an elective surgery when the office was short staffed, although Knisley testified that the surgery was medically necessary. Doc. 40-8 at 4–5; Doc. 40-15 at 42; Doc. 40-18 at 10.

9

she was unsure whether Knisley was joking about trading food for tickets and taking food from the community gardens and that her primary concern with Knisley was that she believed Knisley did not want to be at work or help with anything. Doc. 40-19 at 12–14.

Lanning, Pulford, and Talich each attested that they were unaware that Knisley had reported Walburg's misuse of DUI grant monies at the time they wrote out their concerns. Doc. 32 at ¶ 4; Doc. 33 at ¶ 4; 34 at ¶ 4. Each deputy also affirmed that their statements were independently made and that no one asked them to provide the statements in an effort to build a case against Knisley. Doc. 32 at ¶¶ 2–3; Doc. 33 at ¶¶ 2–3; Doc. 34 at ¶¶ 2–3.

Around this same time, in August of 2013, the Lake County Auditor's Office completed an exit interview of a detention officer who was leaving Lake County for a higher paying position. Doc. 35 at ¶ 9. Walburg testified that the detention officer noted in his exit interview that the thing he liked least about his job was Knisley because she was "unwilling to put the time and effort in to do her job properly . . . [and] that she seemed to think that she doesn't have to do her job." Doc. 35 at ¶ 9.

Walburg went to the Commissioners and discussed terminating Knisley during an executive session on August 20, 2013.[8] Doc. 28 at ¶ 27; Doc. 39 at ¶ 27. Walburg testified that he told the Commissioners that Knisley's performance had not improved since the 2013 Performance Evaluation, including issues with completing thorough and timely reports. Doc. 40-16 at 31. Termination was the only option considered for Knisley because both Giles and Walburg recommended that Knisley be terminated. Doc. 40-23 at 14; Doc. 40-24 at 11. The executive meeting continued on August 27, 2013, and the commissioners again discussed Knisley's termination. Doc. 40-10 at 2; Doc. 40-23 at 17. Knisley was informed of her

---

[8]Commissioner Golden was not present at the executive meeting on August 20, but Giles later updated him as to what occurred. Doc. 40-26 at 4.

termination on August 28, 2013, Doc. 40-15 at 10, and the Commission voted to support the termination on September 3, 2013,[9] Doc. 40-11 at 2–3.

Four of the five County Commissioners denied knowing at the time of terminating her employment that Knisley had reported Walburg's suspected criminal activities to outside authorities. Doc. 28 at ¶ 10; Doc. 39 at ¶ 10. The fifth Commissioner, Wollman, never told the other four Commissioners that Knisley instigated the Walburg investigation. Doc. 28 at ¶ 11; Doc. 39 at ¶ 11.[10] Wollman testified that Knisley's report on Walburg was not a factor in her determination of whether Knisley should have been terminated. Doc. 36-4 at 2–3.

After her termination, Knisley continued to report her suspicions about Walburg. Doc. 40-15 at 47. Knisley testified that she made further reports about Walburg's handing of DUI grant funds after her termination to the South Dakota Attorney General Marty Jackley, the FBI, the United States Attorney's Office, and the Department of Justice. Doc. 40-15 at 35. Ultimately, Walburg was never charged for the crimes Knisley believes he committed. Doc. 28 at ¶ 8; Doc. 39 at ¶ 8.

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 places the burden initially on the moving party to clearly establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Id.; see also Celotex Corp. v. Catrett, 477 U.S.

---

[9]Commissioner Pederson testified that on August 27, 2013, an unofficial decision was made to terminate Knisley while she was at work. Doc. 40-23 at 17.

[10]Wollman testified that she told two people about Knisley's report to the DCI: Giles and, concerned about her personal liability, Bob Wilcox, Executive Director of the South Dakota Association of County Commissioners. Doc. 40-22 at 8, 10.

11

317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B). "A party opposing summary judgment may not rest upon mere allegations or denials contained in the pleadings, but must, by sworn affidavits and other evidence, set forth specific facts showing that there is a genuine issue for trial." Mehrkens v. Blank, 556 F.3d 865, 868–69 (8th Cir. 2009). "If 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party, as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Reed v. City of St. Charles, 561 F.3d 788, 790 (8th Cir. 2009)). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (internal quotation marks omitted) (quoting Celotex Corp., 477 U.S. at 327).

## III. DISCUSSION

Knisley brings her federal First Amendment retaliation claim under 42 U.S.C. § 1983. Doc. 1. "In order to survive a motion for summary judgment under § 1983, the plaintiff must raise a genuine issue of material fact as to whether (1) the defendants acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." Mann v. Yarnell, 497 F.3d 822, 825 (8th Cir. 2007) (quoting Cooksey v. Boyer, 289 F.3d 513, 515 (8th Cir. 2002)). Defendants have not contested that they acted under color of

12

state law. See Docs. 29, 41. Knisley and Defendants agree that the same standard and law applies to her federal and state claims of violation of free speech. See Doc 37; Doc. 41 at 2. Therefore, this Court focuses on whether Knisley has satisfied the requirements for a First Amendment retaliation claim.

To make a prima facie case of retaliation, Knisley must show that "(1) [s]he engaged in activity protected by the First Amendment; (2) the defendants took an adverse employment action against h[er]; and (3) the protected conduct was a substantial or motivating factor in the defendants' decision to take the adverse employment action." Lyons v. Vaught, 781 F.3d 958, 961 (8th Cir. 2015). "If the plaintiff meets this burden, the burden shifts to the defendant[s] to demonstrate that the same employment action would have been taken in the absence of the protected activity." Davison v. City of Minneapolis, 490 F.3d 648, 655 (8th Cir. 2007).

To determine whether speech is constitutionally protected, courts, as a threshold matter, first consider whether the employee spoke as a citizen on a matter of public concern. Id. "To determine whether speech qualifies as a matter of public concern, [courts] must examine the content, form and context of the speech, as revealed by the whole record." Anzaldua v. Ne. Ambulance & Fire Prot. Dist., 793 F.3d 822, 833 (8th Cir. 2015) (quoting Sparr v. Ward, 306 F.3d 589, 594 (8th Cir. 2002)); see also Lane v. Franks, 134 S. Ct. 2369, 2380 (2014). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is a subject of general interest and of value and concern to the public." Lane, 134 S. Ct. at 2380 (internal quotation marks omitted) (quoting Snyder v. Phelps, 562 U.S. 443, 453 (2011)). "When speech relates both to an employee's private interests as well as matters of public concern, the speech is protected if it is primarily motivated by public concern." Anzaldua,

793 F.3d at 833 (quoting McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 866 (8th Cir. 2009)). If the employee's main motivation for the speech was to further her own "private interests rather than to raise issues of public concern, her speech is not protected, even if the public would have an interest in the topic of her speech." Altonen v. City of Minneapolis, 487 F.3d 554, 559 (8th Cir. 2007). Knisley bears the burden of demonstrating that her speech is protected, id., and "[t]he inquiry into the protected status of speech is one of law, not fact." McCullough, 559 F.3d at 866 (quoting Connick v. Myers, 461 U.S. 138, 148 n.7 (1983)).

In Garcettti v. Ceballos, the Supreme Court of the United States held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline." 547 U.S. 410, 421 (2006) (finding an internal memorandum prepared by a prosecutor in the course of his ordinary job responsibilities constituted unprotected speech); see also Lane, 134 S. Ct. at 2378 (stating that employee speech is not protected if made pursuant to an employee's "ordinary" job duties). The Garcetti court did not clearly articulate a formula for determining whether an employee's speech was made pursuant to his or her official job duties and indeed noted that there are some cases where employees "may receive First Amendment protection for expressions made at work." Id. at 420. The dispositive factors are not the employee's job description, whether the speech concerns the subject matter of employment, or whether the employee expresses herself in the office. Id. at 420–21, 424–25; see, e.g., id. at 424–25 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First

14

Amendment purposes."). Rather, the "controlling factor" is whether the employee's speech was made pursuant to her job duties. Id. at 421 (noting the controlling factor in that case was "the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case").

Many federal cases interpreting Garcetti have made clear that an employee's speech relating to tasks within that employee's uncontested responsibilities is not protected from regulation. See, e.g., Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1329 (10th Cir. 2007) (stating that when the speech concerns a matter within the employee's "portfolio" it is made "pursuant to her official duties"); Wilburn v. Robinson, 480 F.3d 1140, 1151 (D.C. Cir. 2007) (same). Additionally, the United States Court of Appeals for the Eighth Circuit has emphasized restrictive language from Garcetti that employees will not be entitled to First Amendment protection where the employee's speech "'owes its existence to a public employee's professional responsibilities.'" Bradley v. James, 479 F.3d 536, 538 (8th Cir. 2007) (quoting Garcetti, 547 U.S. at 421–22); see also Kline v. Portage Cty. Bd. of Comm'rs, 5 F. Supp. 3d 902, 914–15 (N.D. Ohio 2014) (same); Mantle v. City of Country Club Hills, No. 4:07-CV-055 (CEJ), 2008 WL 3853432, at * 4 (E.D. Mo. 2008) (same); Cheek v. City of Edwardsville, 514 F. Supp. 2d 1220, 1231 (D. Kan. 2007) (same). This restriction "'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" Bradley, 479 F.3d at 538 (quoting Garcetti, 547 U.S. at 421–22).

Knisley's report involved a matter of public concern—possible abuse by a public official of federal grant money. See Lane, 134 S. Ct. at 2380. Defendants argue that Knisley's speech is not protected speech because Knisley testified that she investigated Walburg pursuant to her official duties as a deputy for Lake County. Defendants cite three cases—Buehrle v. City of

15

O'Fallon, 695 F.3d 807 (8th Cir. 2012), Gibson v. Kilpatrick, 773 F.3d 661 (5th Cir. 2014), and Gilbert v. Flandreau Santee Sioux Tribe, 2006 SD 109, 725 N.W.2d 249—to support their claim that Knisley was acting within the scope of her employment in making her reports of Walburg's possible misconduct. Doc. 29 at 11–14. In Buehrle, the Eighth Circuit held that a police officer who orally delivered findings of a report he conducted to the City's Board of Aldermen was not afforded First Amendment protection because his speech was made within the scope of his official duties. 695 F.3d at 812. In 2005, the mayor requested that Officer Buehrle be assigned to conduct special investigations into suspected wrongful acts of other city officials and employees. Id. at 809. At the request of a city administrator, Buehrle reported the findings of his report to the Board of Aldermen in a closed session. Id. at 809–10. Buehrle's report and findings—which included recommended procedural changes and comments about corruption among local officials—angered the city administrator. Id. After the closed session, Buehrle unsuccessfully sought three promotions from 2007 to 2009. Id. at 809–11. The Eighth Circuit found that in sharing his report and findings, Buehrle spoke as a part of his official duties and not as a public citizen. Id. at 812. The Eighth Circuit reasoned that Buehrle's speech was not protected because he was assigned the special investigator role, reported directly to the mayor, and relayed his conclusions from his investigative report to the Board of Aldermen; thus, his speech "'owe[d] its existence to . . . [his] professional responsibilities.'" Id. (quoting Garcetti, 547 U.S. at 421–22).

In Gibson, the United States Court of Appeals for the Fifth Circuit held that a police chief's investigation and reporting of his supervisor was made pursuant to his job duties and did not constitute protected speech. 773 F.3d at 672–73. In that case, Chief of Police Gibson— believing that his supervisor, the mayor, had misused the city's gasoline card—reported to

16

outside law enforcement agencies, including the FBI, the Drug Enforcement Administration (DEA), the State Auditor's office, and the State Attorney General's office. Id. at 664–65. The State Auditor's Office initiated an investigation, with assistance from Gibson, and concluded that the mayor had misused gas funds; the mayor was ordered to repay the city approximately \$3,000. Id. at 665. In the months following the investigation, the mayor began issuing Gibson numerous written reprimands and frequently recommended Gibson's termination to the city's Board of Aldermen. Id. Gibson was ultimately terminated. Id. The Fifth Circuit reasoned that Gibson's reports were not protected speech because Gibson had previously communicated with the outside agencies as part of his job responsibilities, reported his concerns to agents whom he had met through his official duties, worked with the FBI and the DEA during his role as Chief of Police, and had job duties defined by state statute including the main responsibility of "the prevention and detection of crime." Id. at 670–71 (internal quotations and quotation omitted). The Fifth Circuit refused to apply a general rule deeming an employee not to be acting pursuant to his or her duties when a report is made outside the workplace because in Gibson's case reporting internally was "clearly . . . undesirable" and reporting to outside agencies "may well have been the most appropriate." Id. at 671. Finally, although Gibson had confidentially met with agents from the FBI and the DEA outside of his official office, Gibson already knew the agents, previously worked with both agencies, and there was no evidence that Gibson offered to assist in those investigations, made those reports while in uniform, or met with the agents during working hours. Id. at 671–72.

In Gilbert, the South Dakota Supreme Court held that Gilbert, an education coordinator for the Flandreau Santee Sioux Tribe ("the Tribe"), was acting pursuant to her official job duties when she wrote a letter to the Tribe's executive committee. 2006 SD 109, ¶¶ 4, 14–15, 725

17

N.W.2d 249, 252, 256. In the letter, Gilbert complained of a recent political appointment and noted various office concerns, including violence in the workplace. Id. ¶ 4, 725 N.W.2d at 252. She was terminated for writing the letter and for violating the Tribe's political activity policy. Id. ¶ 5, 725 N.W.2d at 252. Because Gilbert wrote the letter during work hours, on tribal stationery, and in her capacity as education coordinator, the state court held that Gilbert was acting within the scope of her employment and that the First Amendment's protections were not applicable. Id. ¶¶ 4, 15, 725 N.W.2d at 252, 256.

Knisley argues that Buehrle, Gibson, and Gilbert are factually distinguishable from the case at bar and counters that a case from this district, Jorgensen v. Schneider, No. 10-cv-05021-JLV, Doc. 75 (D.S.D. Sept. 27, 2012), is more on point. In Jorgensen, all police officers including plaintiff Jorgensen were asked by a city council member to attend a grievance hearing regarding another co-worker's complaint. Id. at 19. Jorgensen, along with five other officers, attended the hearing. Id. at 20 n.18. Jorgensen was not on duty, but he wore his uniform because he was unsure how to dress. Id. at 20–21. The officers were told by the city attorney that their attendance at the meeting was not compelled and that they had the choice to leave or to stay and testify. Id. at 19–20, 48–49. Jorgensen testified and was later paid for two hours of work under a standing policy of the city. Id. at 21. Judge Viken found that Jorgensen's testimony at the grievance hearing touched on matters of public concern and that Jorgensen truthfully testified as a public citizen about the Chief of Police's use of racial epithets, derogatory language, and impermissible tactics on other officers. Id. at 50–51. The Jorgensen decision did not contain much analysis of the key question here—whether the officer's statements were made as part of job duties.

The Court finds Knisley's case most analogous to Buehrle and Gibson. Based on her own testimony, Knisley's speech "'owe[d] its existence'" to her employment as a Lake County deputy. Buehrle, 695 F.3d at 812 (quoting Garcetti, 547 U.S. at 421–22). As a deputy for Lake County, Knisley believed that she was to investigate any Lake County resident suspected of criminal activity and that she had the right to obtain relevant documents and conduct the investigation of Walburg. See also Mantle, 2008 WL 3853432, at *4 (stating that because plaintiff was a police officer, he had a duty to investigate and report alleged criminal acts). The Eighth Circuit and other federal courts have found no First Amendment protection of speech where an employee acknowledges that the speech at issue arose out of the employee's job duties. See Bonn v. City of Omaha, 623 F.3d 587, 592–93 (8th Cir. 2010) (finding that employee's speech was not protected by the First Amendment where employee admitted that her report was prepared pursuant to her position as an auditor); see also Kline, 5 F. Supp. 3d at 913–14 (holding that employee's speech was made in connection with her job duties because employee described her job duties to include various accounting tasks and each of her complaints related to her responsibility as accounting supervisor); Cheek, 514 F. Supp. 2d at 1223–24, 1231 (concluding that police officers' speech was not protected because it was undisputed that officers were responsible for investigating criminal conduct); Wilburn, 480 F.3d at 1151 (finding employee's allegation of employer's discrimination fell within scope of her employment because employee admitted that her responsibilities included salary, hiring, and personnel matters). Moreover, Knisley's investigation required special knowledge of how employees of the Lake County Sheriff's Department recorded hours work, including reporting time worked on regular shifts and time worked under the federal DUI grant. See also Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 694 (5th Cir. 2007) (finding that athletic director's speech was not protected because

19

the report prepared included information about tournaments and payment of entry fees that only principal, office manager, and athletic director would know). Even though Knisley's speech involved the unusual predicament of investigating and reporting a supervisor, her speech was generally consistent with the type of activities a deputy would be expected to perform. Garcetti, 547 U.S. at 421 (noting that this seemingly harsh restriction "simply reflects the exercise of employer control over what the employer itself has commissioned or created"); see also Bradley, 479 F.3d at 538.

Knisley argues that her speech is protected because she reported her suspicions to outside authorities. For the reasons set forth in Gibson, Garcetti's practical application does not support Knisley's argument. See Gibson, 773 F.3d at 670. Reporting to external authorities does not automatically transform every other aspect of the employee's actions into ones that were made outside the scope of his or her official duties. Knisley also asserts that she "independently" investigated Walburg "on her own time." Doc. 37 at 5. Those assertions, however, are not supported in the record. Mehrkens, 556 F.3d at 868–69 (stating that on summary judgment the opposing party "may not rest upon mere allegations . . . contained in the pleadings"). Knisley enlisted assistance from a Lake County dispatcher to gather documents in her investigation of Walburg, and although Knisley testified that she used her cell or home phone to make reports to the State Highway Department, the DCI, and the Attorney General's office, Knisley could have used her cell phone during working hours or could have used her home phone while on call. Doc. 40-15 at 26, 31.

As a matter of law, Knisley has not shown that her speech was made in her capacity as a citizen rather than as part of her official job duties and therefore her speech is not entitled to protection under Garcetti. 547 U.S. at 421; see also McArdle v. Peoria Sch. Dist. No. 150, 705

20

F.3d 751, 754 (7th Cir. 2013) (holding that an educator's criticism of her superior's use of grant funds provided to their department is speech as an employee, not a private citizen); Patterson v. City of Earlington, 650 F. Supp. 2d 674, 680–81 (W.D. Ky. 2009) (holding that Chief of Police was acting pursuant to job duties where he uncovered evidence of allegations through an investigation and reported his findings to the state police because he believed that entity was the "most appropriate authority"). Because this Court has now ruled that Knisley's speech is not entitled to First Amendment protection, there is no reason to address the remaining issues in briefing, and summary judgment for Defendants must enter therefore.

## IV.   CONCLUSION

For good cause, it is hereby

ORDERED that Defendants' Motion for Summary Judgment, Doc. 27, is granted.

DATED this 12ᵗʰ day of April, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

21